## WILSON v. WILSON.

No. 13701.

Court of Civil Appeals of Texas. Dallas.
Nov. 22, 1946.

Rehearing Denied Jan. 1, 1947.

W. J. Durham, of Dallas, for appellant.

Paul T. McMahon, of Dallas, for appellee.

BOND, Chief Justice.

This cause coming on to be heard on appellee's motion for rehearing, and same being considered together with the original and supplemental record filed since our former opinion, we conclude that our former opinion and judgment heretofore entered should be set aside and, in lieu thereof, the following substituted; on which, judgment is here based.

Plaintiff Sterling Wilson brought this suit for declaratory judgment against defendant Ella Wilson to determine, adjudge and decree the rights of plaintiff in and to Lots 17 and 18 in Block N/2604, Lots 9, 10, 12, 13, 14 and 15 in Block P/2606, and Lots 21 and 22 in Block O/2605, in the City of Dallas, Texas, and to declare such decree to have the force and effect of final judgment.

Each claimant sets forth the nature of his claim, plaintiff declaring that the property deeded to defendant was community of his father, Grant Wilson, and Ella Wilson, it having been purchased by them with joint earnings during coverture and, for convenience, deeded to Ella Wilson; that Grant Wilson and Ella Wilson were lawfully married on December 2, 1908 and lived together as man and wife until Grant died, on or about September 15, 1942; that his father died intestate, leaving surviving his said wife and the plaintiff, his only child, born of a former marriage; the defendant answering that the property in suit

was her separate estate, purchased with her separate funds; and, in the alternative, that if any community funds were used in the purchase of any of said property, Grant Wilson, having caused the deeds to be executed to her, or having acquiesced in the deeds being made in her name, intended thereby that such conveyances were a gift or gifts to her; otherwise, there is no gift declaration pleaded. Manifestly, the defendant, in pleadings, was in doubt as to whether some of the property was purchased with her separate funds or acquired as gifts from her husband solely because of the deeds having been taken in her name.

On trial to the court without a jury, on findings that defendant is and has been, since the date of acquisition of said lots, the sole owner thereof and plaintiff's claim thereto a cloud upon her title, judgment was entered in favor of defendant removing the cloud and for possession of all the lots as her separate estate.

■■■ It is a rule of law in this State that all property purchased after marriage is presumed to be community, and that presumption obtains until the contrary is shown and established by full, clear and convincing evidence; Davis v. Duncan, Tex.Civ.App., 103 S.W.2d 287; and that a surviving spouse, claiming property purchased after marriage as his separate estate, has the burden of proving that it was purchased with his separate funds or that it was conveyed in a manner to impress the property as a gift to the survivor. It is also well settled that where property is acquired for a consideration paid in part out of community funds and in part out of separate funds of the spouses, the two estates are owned as if tenants in common; John Hancock Mutual Life Ins. Co. v. Bennett, 133 Tex. 450, 128 S.W.2d 791. The status of property, whether separate or community, is fixed as of the time of the inception of title; Dakan v. Dakan, 125 Tex. 305, 83 S.W.2d 620.

■■■ With these rules in mind, the facts upon which the defendant claims the property as her separate estate are not at all clear; certainly, to our mind, not in all details full, clear and convincing. As noted above, at the time of the inception of title to the property, Grant Wilson and Ella Wilson were husband and wife; the lots, other than Lot 15, were conveyed to the wife by deeds which did not disclose whether they were conveyed to her as her separate property, or as community; nor was there any indication in the deeds that the consideration paid was other than community. The deed to Lot 15, dated August 12, 1924, expressly recites that the $350 consideration paid in cash was the separate fund of Ella Wilson, and conveys the lot to her as her sole and separate property; and, there being no evidence on part of plaintiff to rebut such recitals, it must be held that Ella Wilson acquired Lot 15 as her separate estate, paid out of her separate funds. The mere fact that the deeds to the other lots recite that the wife is the grantee evidences no presumption as being her separate property, or gifts. However, there is evidence that, at the time of the acquisition of Lot 15, Ella Wilson sought advice and obtained counsel from her attorney who had theretofore prepared all of the other deeds to the lots in suit, to have this deed made to convey Lot 15 as her separate property, paid for out of her separate funds. It seems, from the evidence, that Ella's said attorney advised her to have her husband present in the preparation of this particular deed; and the evidence discloses that her husband was present and acquiesced in the deed recitals. No such action occurred in the preparation of the other deeds. Thus it is conclusive that, defendant taking the precaution to have this deed so executed, presumptively the property conveyed became the personal estate of Ella Wilson, regardless of the source of the funds with which said property may have been purchased. However, Ella testified that the funds came from her deposited savings from the estate she inherited from her first husband.

■■■ The status of the other lots, whether separate or community, as adduced from the evidence, is more difficult of solution because of the inconsistent, contradictory and varied testimony of the defendant. To rebut the presumption of community, the burden of proof was upon the defendant to show, by full, clear and

convincing evidence, that at the time of inception of title thereto, the consideration paid therefor was acquired by inheritance or by gift from her husband. These lots were deeded in name to Ella Wilson:—Lots 9, 10 and 12 on January 30, 1915 for a cash consideration of $250; 13 and 14 on September 30, 1915 for $407.21; 17 and 18 on March 19, 1923 for $450, and 21 and 22 for $450; and, all of the aforesaid lots, having been acquired during the marriage of Grant Wilson and wife, under the statutes of this State (Art. 4619, Vernon's Ann.Civ.St.) are presumed to be community. The deeds do not purport to convey the property to Ella Wilson to vest title in her as her separate estate, as was done in the subsequent deed to Lot 15, purchased in 1924. Hence, they evidence community, unless Ella's testimony repels by clear and convincing proof that they were purchased with her individual money or property. Brick & Tile, Inc., v. Parker et al., 143 Tex. 383, 186 S.W.2d 66, 67; Young v. Magee, Tex.Civ.App., 196 S.W.2d 203. Any declaration, not made at the time the property was acquired, that the lots had been bought with the wife's separate funds, or that the husband disclaimed any interest therein, embodies merely the conclusion or opinion of the declarant. Title to real estate cannot be divested out of an owner by oral declarations that the one holding an interest therein disclaims all rights thereto. There is no rule that one holding title to real estate may be estopped by disclaiming interest therein, as contended by appellee. The issue as to whether the land was community or separate property cannot be established by this character of uncertain and unconvincing evidence; Vaughn v. Vaughn, Tex.Civ.App., 287 S.W. 687. Ella and her attorney both testified that Grant disclaimed to them all interest in the property purchased in name of his wife and declared by him as belonging to his wife.

On the issue of whether the property was acquired with separate funds, Ella testified, in effect, that she and her first husband, Alfred Bird, came to Texas about 1893, from the State of Mississippi, locating at Italy, Texas; that her first husband died in 1894, leaving surviving his said wife (enceinte) and an estate of 52 acres of land and some personal property in Mississippi; that she inherited this property, or one-half of it (evidently one-half went to her child, subsequently born after her husband's death), and that she sold it about the next year after his death, but differs as to the amount received. In one instance she said she got $300 for the livestock and farm implements; in another instance, $800 for such personal property; again, said she sold all the land and personal property in Mississippi for $600 or $800; that she sold the 52 acres of land she inherited for $600 and, thereafter, with the money from all of such inheritance, she purchased a house and lot in Italy, Texas, paying therefor, in one instance she said $125 for the land and $300 or $400 for the house; in another instance, $150 for the lot, and erected thereon a house for $400 or $500 and a chimney costing as much as the house. She further testified that about two years after her first husband's death she sold the Italy property for about $600, and out of that paid $50 or $75 funeral expenses of her husband and the doctor's bill for his last illness, the amount of which she could not remember; and that when she moved to Dallas she did not know how much money she had. It will be seen that there is no evidence offered to show how Ella inherited the entire estate of her husband, to the exclusion of their child.

Analyzing Ella's testimony, she acquired an amount from $900 to $1,600 from the estate of her first husband, and expended it on the Italy property to an amount from $425 to $1,550. Thus, if her receipts and disbursements of money received from sale of the property she inherited from her first husband are correct, she had none of that estate at the time she married Grant in 1908, other than the $600 she received from the sale of the Italy property less the funeral expenses and doctor's bill of her deceased husband. Thus, crediting her account with such inheritance, she had the $600, and her personal earnings, when she moved to Dallas.

Ella further testified that in 1896 she moved to Waxahachie, Texas, where she lived for eight years, working as maidservant in the home of Judge Dunlap at a salary of $20 per month, and that she "saved

every cent of it," living off of the rents from her Italy property, which had been rented for $15 per month, for a period of about two years; and that she had all of her eight-years' earnings and her inheritance from her husband when she came to Dallas in 1904, but could not say how much money she had accumulated, or had, when she moved to Dallas. In November 1904, she began working for a Mr. Tenison at a monthly salary of $25 per month, with servant's quarters furnished, which salary she said she also "saved every cent of" and caused it to be deposited in the City National Bank of Dallas with her other savings Thus, giving full faith and credit to Ella's uncorroborated testimony, which is, indeed, hard to do, it will be seen that she saved from her salary of $20 and $25 per month, prior to the time she married Grant, the sum of $3,120; and that, too, after financing her wants and, in the absence of proof otherwise, we may well assume that she also financed the needs of her minor child; and, in addition thereto, it will be seen that she claims the inheritance was saved, making her accumulation approximately $4,750 to $5,250 within the 12 years. We are unable to follow her financial statement in the light of her other disclosures.

Ella further testified that in June 1908, with the money she had saved from her salary and had on deposit in the bank, she purchased a house and lot in the City of Dallas, known in the record as the "Good Street property," paying therefor, in one instance she said $1,650; in another $1,700; and in still another $1,750. The deed in evidence shows that the consideration was $1,750, $800 cash and $950 in nine deferred $100 installment notes, and one for $50, payable monthly, which Ella finally admitted was the correct consideration paid for the property. She said that after purchasing this property, she had "something like" $3,000 or $3,500 in the bank. She further testified that soon thereafter, out of her savings deposited in the bank, she made improvements on the Good Street property, or remodeled the house, at an expense of $600 and erected a fence around the lots costing $600, paid out of her savings; that in 1915 she bought the lots on Mockingbird, Lemmon and Victoria Streets (Lots 9, 10, 12, 13 and 14) for a consideration of $657.-21; in 1923 purchased four other lots—two at corner of Roper and Savage Streets (Lots 21 and 22) and two at corner of Savage and Victoria Streets (Lots 17 and 18), at a total consideration of $900, of which $800 was paid out of her bank deposits and $100 out of savings of rents acquired from her Good Street property since her marriage to Grant; and in 1924 she purchased Lot 15 for $350, also paid out of her said deposits.

Conceding that Ella acquired an inheritance from her husband in Mississippi, she gives no account of the interest her child should have inherited, and offers no evidence from the court records of Mississippi to substantiate her claim. On cross examination, she repeatedly testified that she could not recall the various amounts she had received, or when and how she had expended any of it. In one instance she testified:

"Q. * * * About what was the value of the property and the money that you had before you married Grant, besides the Good Street property? A. Well, I don't know. I know what money I had, but, then, I didn't know the valuation of what I owned.

"Q. Well, you gave us some valuation here awhile ago, what you got for this property? A. Yes, well, I never multiplied it or added to it to see. * * *

"Q. And you continued to rent it after Grant married you? A. I continued to rent it after Grant married me.

"Q. And you took this rent and put it in the bank along with your other money, didn't you? A. No, I don't remember.

"Q. What did you do with your rent? A. I don't know. Could I remember what I would do with $15 a month? I wasn't getting but $15 a month. Now, could I remember what I was doing. * * *

"Q. You tell the court you paid the full $1,700, or whatever the price was on the Good Street property, you say that was all your money? A. That was all my money.

"Q. All your money, and the money you had as your separate property what your mother and father gave you, and what you got from your husband? A. And what I made working.

"Q. Now, I believe you said you had $888 in the bank (after purchasing Lots 9, 10, 12, 13, and 14 at $657.21)? A. I did.

"Q. When you bought—that was the money you had? A. That was all the money I had. * * *

"Q. Just approximately how much did you have? A. After I bought the Good Street property?

"Q. After you bought the Good Street property? A. When did I buy the Good Street property?

"Q. In 1908. A. 1908. I married Grant in 1908.

"Q. Yes, ma'am. A. I had something like $3,000. * * *

"Q. Now, how much money did you actually have when you came to Dallas? A. That is hard to tell. I didn't itemize just how much I had.

"Q. Well, you had it in the bank? A. Oh, yes, but I didn't notice how much.

"Q. But how much did you have, now, your best judgment, how much did you actually have? A. When I came to Dallas?

"Q. Yes, Ma'am. A. I couldn't tell you.

"Q. How much money did you have cash when the property on Good Street was purchased? A. The property over on Good Street?

"Q. Yes. A. Oh, I had enough to pay for it cash, but I was trying to sweat them, and to save interest. I paid through the Boss. He said 'I would pay for them all; they ain't coming down on them.'

"Q. You had enough money to pay for them? A. I sure did.

"Q. And that was $1,700? A. Seventeen or seventeen-fifty. It is so hard to go back and remember.

"Q. I understand, but that is how much money you had? A. No, I had more money than that.

"Q. Where did you have that money? A. In the bank.

"Q. This same bank? A. This same bank.

"Q. Did you write a check for this money? A. For the Good Street property?

"Q. Yes. A. I don't .know.

"Q. What is your best judgment, did you or did you not write a check? A. I don't know whether I wrote a check, or just told the Boss to pay the note, the note was in the bank.

"Q. All the money you had was in the bank? A. No, not all the money I had wasn't in the bank.

"Q. Well, now, how much did you have out of the bank? A. I didn't have any of Grant's, and I can't tell you.

"Q. You don't recall that? A. And I can't tell just how much I did have after —Now, it didn't cost a nickel of his money. I brought that money with me."

We think the testimony of Ella Wilson, as reflected from this record, is so varied and uncertain that it fails to disclose that the money that went into the purchase price of all lots in question was acquired by her from her personal earnings and inheritance before she married Grant Wilson. It is almost inconceivable that a colored maidservant in 1896, when she was about 24 or 25 years of age, for about eight years would have allowed her employer to retain her salary of $20 per month and invest it in real estate loan,—she not spending "a cent" for any purpose, for her pleasures and needs and those of her child, and thus saved $1,920; and it is likewise inconceivable that from 1904 to 1908, from a salary of $25 per month from another employer, she could have accumulated an additional amount of $1,200. She does not seek to corroborate her account of savings from bank records or from indentures of real estate loans; or explain why she had not saved any money, but spent all she made, since her marriage to Grant. However, accrediting her statements of having $3,120 of her wage earnings and about $600 from the sale of her Italy property at the time she purchased the Good Street property, she then had about $3,720; then, debit her account with the $1,750, purchase price of the Good Street property, and $1,200 for the improvements she placed thereon, $250, purchase price of Lots 9, 10 and 12; $407.21 for Lots 13 and 14; and $350 for Lot 15; such will account for more than her savings on deposit when she married Grant Wilson.

Hence, some of the consideration paid for Lots 13 and 14, and all of Lots 17, 18, 21 and 22, must have been acquired with community funds, unless it can be said that such community, by agreement of the spouses, was conceded to Ella as her separate property.

We do not think the evidence discloses an agreement as to change the status of the community earnings of the respective spouses, as to make such earnings his or her separate funds. Ella testified that she and Grant kept separate accounts in the bank, and at home, of their wages, and each considered that what the other made was his or her separate money; that they had an understanding that the rents from the Good Street property and her personal earnings would be her separate estate. That is, she said: "He always considered that as my own, the revenue for my own; he says, well, we didn't have really anything to say; he just says 'Here is your rent, what are you going to buy now?' I said 'I will put it in the bank, or I will put it away, we will need it' or something like that. He never bothered nothing about mine."

Further, to questions, she answered:

"Q. I believe * * * you and your husband agreed that if you bought some property, it would be your property? A. It would be mine, wouldn't it?

"Q. When did the agreement take place? A. It took place when we decided we would buy some Lots.

"Q. It took place when you decided you would buy some Lots? A. You know it was bound to have been before we bought it that we had this conversation.

"Q. All right. Before. Now that was the only agreement you had, was before you bought the property, is that right? A. (Witness nods head).

"Q. * * * Now, this morning you testified that there was no agreement; he didn't say anything directly about it, but you went on and bought it, and it was your property and your money, and you knew it was your property. Didn't you testify to that? A. That is the way he always had it; it was mine; like I bought a chicken or turkey, it was my turkey.

"Q. It was your turkey? A. Yes. or my chicken. If he bought anything, it was Grant's.

"Q. That was about the same agreement you would have all along, whenever you would go buy anything, that was yours? A. That was mine. If he bought anything, it was his. * * * I didn't buy it with any of his money. * * *"

Earlier in her testimony, Ella testified:

"Q. * * * Did you ever tell Sterling that Grant owned any part of that property out there? A. No, sir. He didn't have but one lot, and he sold that. That didn't have anything to do with it. He had that money saved up, and he bought a lot at the time I bought those four lots, and he sold it and put the money in the bank.

"Q. And you all agreed that the lots he bought would be his? A. And what I bought was mine.

"Q. And all the other property would be yours? A. He said I was welcome to it."

We are not unmindful of the rule, as often expressed, that, in absence of findings of fact, Courts of Civil Appeals must sustain the judgment of the trial court if there is sufficient probative evidence in support of such judgment, and appellate courts will not substitute opinions with respect to the credibility of the witnesses and the weight of the evidence. However, appellate courts shall give full consideration to uncontroverted conflicting testimony relied on to establish the cause of action, or its defense, and shall make conclusions as affecting the legal status of the parties to the subject matter involved.

We think the testimony of the defendant, giving it a most liberal interpretation, establishes that the Good Street property purchased in 1908 for $1,750, and the $1,200 improvements she placed thereon, were acquired with the separate funds of the defendant; that Lot 15 in Block P/2606, deeded to the defendant for $350, was acquired with her separate estate; that Lots 9, 10 and 12 in Block P/2606, purchased in January 1915, for $250, were purchased with defendant's separate funds; that Lots 13 and 14 in Block P/2606, purchased in September 1915, for $407.21, were, to the

extent of $170, paid out of her separate funds, and to the extent of $237.21, from community; that as to Lots 17 and 18 in Block N/2604 and 21 and 22 in Block O/2605, purchased in 1923 for $900, we are unable to trace any of defendant's separate funds that she claims to have had in 1908, into the purchase of said lots. Her testimony that she paid $800 of the consideration out of her inherited estate and $100 from the rents of her Good Street property, is wholly inconsistent and at variance with her other testimony as to the amount she had and subsequently expended. So, we think it must be held that these last four lots were wholly purchased with community funds.

In the light of the uncertainty of such testimony, ordinarily we would be inclined to remand the cause for further consideration by the trial court; but as defendant's testimony on which she relies is so incoherent, inconsistent and varied, and she being so far advanced in years, thus forgetting and forgetful of various details of the involved transactions, we feel the case is as fully developed as it would reasonably be on another trial. Hence to remand the cause would only mean delay in the final determination of the rights of the parties in and to the property involved. Therefore, in accordance herewith, we conclude that Lots 9, 10 and 12, purchased for a consideration of $250, and Lot 15 purchased for $350, are the property of the defendant; that Lots 13 and 14 purchased for $407.21, are the separate property of the defendant to the extent of $170; and to the extent of $237.21, community; and that Lots 17 and 18, 21 and 22, purchased for $900, are community.

Hence, in accordance herewith, the judgment of the court below is affirmed in part and reversed and rendered in part, here vesting title to all of Lots 9, 10, 12 and 15 in Block P/2606, in defendant Ella Wilson as her separate estate; and an undivided interest in Lots 13 and 14 in Block P/2606 in proportion as $288.61 bears to $407.21, or, fractionally, $288.61 over $407.21; and to an undivided one-half of Lots 17 and 18 in Block N/2604 and 21 and 22 in Block O/2605. And to the plaintiff Sterling Wilson, vesting title to an undivided interest

in and to Lots 13 and 14 in Block P/2606 in proportion as $118.60 bears to $407.21, or, fractionally, $118.60 over $407.21; and to an undivided one-half interest in Lots 17 and 18 in Block N/2604 and Lots 21 and 22 in Block O/2605. All costs taxed against the parties in equal proportion.

Affirmed in part; reversed and rendered in part.